Haqnmala

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    -------------------------------x

3    DIEGO MALTA,

4                   Plaintiff,

5          v.                              17 Civ. 3228 (JFK)

6    FOX HORAN & CAMERINI, LLP, *et
     al.*,
7
                    Defendant.             Oral Argument
8
     -------------------------------x
9                                          New York, N.Y.
                                           October 26, 2017
10                                         11:20 a.m.

11   Before:

12                     HON. JOHN F. KEENAN,

13                                          District Judge

14
                          APPEARANCES
15
     CATAFAGO FINI LLP
16        Attorneys for Plaintiff
     BY:  JACQUES CATAFAGO
17
     PETER M. LEVINE
18        Attorney for Defendants

19

20

21

22

23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

Haqnmala

1              THE COURT:  We have here Mr. Malta v. Fox Horan &

2       Camerini and others, and the docket number is 17 Civ. 3228.

3              What we have is a 12(b)(6) motion being made by the

4       defendants.

5              Mr. Levine is here.  How do you do, Mr. Levine?

6              MR. LEVINE:  I am well.  Thank you, your Honor.

7              THE COURT:  Good.

8              As I think you have been told by my very able deputy,

9       Mr. Ryan, you have a half hour, as does Mr. Catafago.

10             MR. LEVINE:  Thank you, your Honor.

11             THE COURT:  Out of your half hour, if you want to

12      reserve time for rebuttal, take five minutes for rebuttal.

13             You may proceed.

14             MR. LEVINE:  Does your Honor prefer that I be at the

15      lectern or at counsel table?

16             THE COURT:  I think you better at the lectern because

17      the microphone is at the lectern, and you will be closer to it.

18             Diego Malta just can't get his story straight.  He

19      says he signed his gift agreement at the direction of the Fox

20      Horan firm, but he also says none of the defendants ever spoke

21      with him or had any contact with him.  How is it possible for

22      any defendant to give him any direction?

23             Apparently, realizing this inherent contradiction

24      makes no sense, Diego Malta says though no one from the Fox

25      Horan firm was present when the gift agreement was given to him

Haqnmala

1    to sign, he nonetheless signed it at the defendant's express

2    instruction.

3            But he also says his brother Robert Malta and Robert's

4    attorney Adam Sherman prevented him from consulting with any

5    attorney at the Fox Horan firm.  He also says he did not even

6    know who had prepared the gift agreement when it was given to

7    him to sign.

8            So, again, what is the real story?

9            THE COURT:  The real story is that these family feuds

10   are the worst type of litigation.

11           Go ahead.

12           That is the real story.

13           MR. LEVINE:  But the Fox Horan firm had nothing to do

14   with this family feud.

15           THE COURT:  Well, it is a family feud that is causing

16   all of this.

17           Go ahead.

18           MR. LEVINE:  Diego Malta says he never would have

19   signed the gift agreement had he known of the tax consequences.

20   But he also says he was drunk and high on Xanax when Adam

21   Sherman give him the gift agreement, and he had no idea what he

22   was doing when he signed it.  Diego Malta says no one from the

23   Fox Horan team, which included a tax partner and a real estate

24   partner, ever raised the subject of taxes with him, but he also

25   says the estate plan entailed the creation of a

Haqnmala

1    generation-skipping trust, the very purpose of which is to

2    avoid or minimize taxes.

3           You have a tax partner not talking about taxes ever.

4    So his current story comes down to this:  Out of the blue he is

5    given a piece of paper to sign.  He has no idea what it is.  He

6    does not understand the implication of signing it.  The person

7    who gives it to him is an attorney who does not represent him.

8    Without asking any questions, without attempting to contact his

9    own counsel, he signed.

10          THE COURT:  Proximate cause is an issue here, isn't

11   it?

12          MR. LEVINE:  You bet you, your Honor.

13          THE COURT:  I bet.  All right.

14          Isn't proximate cause an issue for the finder of fact?

15          MR. LEVINE:  Not based on the admissions of Diego

16   Malta in his state court litigation and in his bankruptcy

17   litigation.  Those admissions sever, obliterate proximate cause

18   in this case.

19          THE COURT:  What specific statements in the state

20   court action and the bankruptcy action do you contend directly

21   contradict his allegations that the defendants were negligent

22   and did not inform him of the tax implications when he signed

23   the gift agreement?

24          MR. LEVINE:  Because he alleged in those cases that

25   his brother Robert Malta, with the aid of Robert Malta's

Haqnmala

counsel, Adam Sherman, prevented him from consulting with the
Fox Horan firm.  They gave him that gift agreement to sign
knowing he was represented by Fox Horan, but made sure the
agreement was given outside the firm's presence, and they gave
it to him when he was drunk and high on drugs and they knew
that.

         And Diego Malta alleged in his bankruptcy declaration:
I have been an addict since 2007.  My brother knows that.  My
brother has taken advantage of me.  He concocted this estate
plan in an effort to steal from me.

         The Fox Horan firm never said to Diego Malta, Here,
sign this, and the Fox Horan firm never told Adam Sherman give
this to Diego to sign.

         Adam Sherman very cagily, in fact a very sleazy move,
gives the Court a truncated version of an e-mail exchange he
had May 9, 2016, with William Kaplan, the real estate partner
at Fox Horan.  In that e-mail exchange that he presents he asks
Bill Kaplan to prepare a gift agreement for Diego.  Kaplan
complies.

         With respect to Robert Malta's gift agreement, Sherman
asked, Can it be signed today?

         When he sent that e-mail, Diego Malta's gift agreement
had yet to be prepared.

         Kaplan says, Sure, you can sign it today if you wish.

         He then sends two draft agreements, one for Diego, one

Haqnmala

```
 1     for Robert under cover of an e-mail May 9, 2016, at 2:34 p.m.
 2              That e-mail is not included in the exchange presented
 3     by Adam Sherman.  In that e-mail William Kaplan says, "For your
 4     review, comment, and perhaps Robert and Enrico's signatures."
 5              Review and comment.
 6              Adam Sherman comes into this court and says, I'm just
 7     an errand boy.  Those are his words.  I'm an errand boy.  I am
 8     just not following directions.  That is not what the e-mail
 9     chain says.  That is not what the full e-mail chain says.
10              THE COURT:  On this proximate cause issue, which you
11     say the case does in a sense turn on proximate cause, in New
12     York, as I understand it, under New York law, there can be more
13     than one proximate cause for an injury, right?
14              MR. LEVINE:  Correct.
15              THE COURT:  OK.
16              MR. LEVINE:  We are alleging -- not alleging, we are
17     contending superseding cause.
18              What was the superseding cause?  Diego Malta gives
19     that explanation in his state court complaint and in his
20     bankruptcy declaration.  He gives actually two superseding
21     causes, the conduct of his brother with the aid of his
22     brother's counsel and his own conduct.  His brother was trying
23     to cheat him and prevents him from dealing with the Fox Horan
24     firm, prevents him from communicating, gives him the gift
25     agreement while he's drunk.  Here, sign this.
```

Haqnmala

 1        Diego's own conduct: I'm drunk.  I'm high.  I don't

 2   know what this document is.  I don't ask any questions.

 3        He goes into state court and says this document must

 4   be torn up because of my lack of capacity.  He has no capacity

 5   to enter into this agreement.  Those are his own words, the

 6   words of his lawyer, the words of his agent, authorized agent.

 7        The Fox Horan firm didn't tell him to sign it.  The

 8   Fox Horan firm didn't direct him to sign it.  His story that he

 9   had no idea that there would be any tax or taxes were never

10   even discussed is implausible on its face.  He alleges in his

11   complaint here and in his declaration the Fox Horan firm didn't

12   even request appraisals.  His own documents undermine that

13   story.

14        The Fox Horan bills, invoices, time sheets show

15   dealings about appraisals.  Of course they requested

16   appraisals.  His own documents show that.  So basically what

17   you have is a litigant who will sign anything that is put in

18   front of his face.  Here's a gift agreement --

19        THE COURT:  Wait.

20        MR. LEVINE:  -- a declaration to the bankruptcy court.

21        OK.  I'll sign it.

22        THE COURT:  Wait a minute.

23        You are blaming the lawyers not him, huh?

24        MR. LEVINE:  I am not blaming the lawyers.

25        THE COURT:  You say he will sign anything they put in

Haqnmala

1   front of him.

2          MR. LEVINE:  Right.

3          THE COURT:  Isn't that the lawyer's fault?  I didn't

4   know you were attacking the lawyers.

5          MR. LEVINE:  I am not attacking Fox Horan.  I am

6   attacking Adam Sherman.  I am attacking his state court counsel

7   and his bankruptcy court counsel.  They are saying, Here, sign

8   it.  So he signs it, swears to it.

9          So which document are you going to believe?

10         Which story are you going to believe?

11         The one coherent story he tells, the one coherent

12  storyline throughout all of these pleadings, including the ones

13  in this court, is this:  He signed a gift agreement at Robert's

14  behest, prodded by Adam Sherman, while he was debilitated by

15  drugs and alcohol.  That is consistent through this proceeding,

16  the state court proceeding, and the bankruptcy proceeding.

17  That is a consistent story.

18         He then changes his mind and tries to get the gift

19  returned.  As he alleges in his state court complaint, his

20  mother and his brother refused, so he sues them.

21         Then he changes his mind again and says, OK, I have

22  resolved my dispute.  And he so represents to Lucy Billings in

23  Supreme Court New York County.  I have resolved the dispute.

24  He comes into this court and he says, I dropped the case

25  because I knew I couldn't win it.  Again, a change of story.

Haqnmala

1          He resolves his dispute and he decides to go forward

2     with the estate plan, which includes a generation-skipping

3     trust, and he does that after July 5, 2016.

4          What is the significance of that date?

5          On that day, and it's in the record, he has a meeting

6     at the Fox Horan firm.  It is at that time he alleges that he

7     first learns about the taxes.  But, knowing about the taxes, he

8     goes forward with the he is estate plan.

9          Then he says:  OK, I'll take the generation-skipping

10    trust.  I will take the benefits of that, but I don't want to

11    pay the gift tax.  The Fox Horan firm will pay the gift tax,

12    will take the obligation.  I'll take the benefit.

13          That's not permissible.

14          And, by the way, both Diego and Robert now say the

15    estate plan, terrible idea, we never should have done it.  If

16    that's the case, tear up these gift agreements.  Don't do the

17    estate plan.  Don't do it.

18          THE COURT:  As I understand it, one of the things you

19    are maintaining here is that estoppel is involved, is that

20    right?

21          MR. LEVINE:  Correct.

22          THE COURT:  All right.  What is the legal basis or the

23    factual basis for the invocation of the doctrine of estoppel?

24          MR. LEVINE:  The legal basis is you take both the

25    benefits and the obligations of the entire transaction.  You

Haqnmala

1    can't separate one from another.

2              If you do a deal and you say buy a piece of property,

3    it has a mortgage on it, you're responsible for the mortgage

4    because you bought the property.  You can't say, Oh, I buy the

5    property, but someone else has to pay the mortgage.

6              We cite several cases that so say.  You take the whole

7    transaction.  If you knew going in what the costs and benefits

8    were what the risks and returns were, if you knew that going in

9    and you went in and did that deal, you take it all.

10             That's what happened here.

11             He says in his bankruptcy petition and I believe the

12   state court complaint as well, I knew on July 5, 2016, from the

13   Fox Horan firm at a meeting I had that there with my brother --

14             THE COURT:  But what is the evidence of detrimental

15   reliance on the part of the defendants?

16             MR. LEVINE:  We are not contending that the Fox

17   Horan -- well, we are not contending that the Fox Horan firm

18   relied on anything said or done by Enrico Malta.

19             What we're saying is Enrico can take part of the deal

20   of the estate plan.  The Fox Horan firm is retained to

21   formulate an estate plan, which Enrico knew or Diego Malta knew

22   would entail first a gift or a transfer of property from him to

23   his mother.

24             THE COURT:  To the mother.

25             MR. LEVINE:  Which would then be placed in trust, in a

Haqnmala

1   generation-skipping trust.

2           So, when Mrs. Malta died, there would be a step-up

3   basis at her death, so the value of these properties would rise

4   from a low basis to a very high basis.  Then those properties

5   can be conveyed from the trust to Diego's heirs with a much

6   higher basis, and the estate tax would either be eliminated

7   altogether or greatly reduced.

8           So the Fox Horan firm engages in step one, prepares

9   the gift agreement.

10          Diego tries to have it revoked, declared void, based

11  on lack of capacity, but then says, I resolved all my problems.

12  I have resolved my dispute.

13          So he goes forward with the estate plan.  He can't

14  have his cake and eat it too.  He can't say, All right, my kids

15  will pay no estate tax or much less estate tax because of this

16  generation-skipping trust, but the essential step to get there,

17  this gift, well, I'm not responsible for any tax that may have

18  to be paid.

19          And, by the way, we still have no proof that Diego

20  Malta has paid any gift tax.  What we have is a draft gift tax

21  return on extension.  The deadline was October 15, about a week

22  ago?  Has he paid?

23          Basically he's coming into court and saying I may one

24  day pay some gift tax, but since it's been calculated at 4

25  million odd dollars, the Fox Horan firm should pay that amount

Haqnmala

1   now.

2            Of course, if I cut a deal with the IRS or if I tear

3   up these gift agreements and don't do the estate plan, I don't

4   have to tell anyone.  I don't have to return any money.  Kind

5   of an interesting way to go about it.

6            But we base both our estoppel argument and our

7   proximate cause argument on Diego Malta's own words.  Diego

8   Malta is trying very hard to run away from those words.

9            He says you can't consider them.  They are not subject

10   to judicial notice.  That is incorrect.  These are party

11   admissions, or the documents that we have submitted are

12   integral to the complaint or they state the procedural history

13   of other litigations or they state the fact, they establish the

14   fact that Jack Catafago and his firm represented Robert Malta

15   in both the state court litigation and in the bankruptcy court

16   litigation and thus was aware of Diego Malta's contradictory

17   statements in those cases and thus had to plead around them

18   when preparing this complaint.

19            They pleaded around them by just ignoring, and we have

20   Second Circuit authority that says, no, you can't do that.  But

21   in terms of documents containing party admissions, those would

22   be Exhibits 2, 3, 12, 13, 14, 15, and Exhibit 9.

23            The engagement letter, the two gift agreements are

24   integral to the complaint, which makes reference to an estate

25   plan and to the representation of the Fox Horan firm.

Haqnmala

1          The documents, the answer and motion, the answer filed

2     by Robert Malta and the motion he made in the bankruptcy court

3     shows the fact of representation by Mr. Catafago in those

4     cases.  Those are Exhibits 18 and 20.

5          But the story that Diego Malta now tells, I acted at

6     the behest, at the direction, at the instruction of the Fox

7     Horan firm is totally undermined by his prior admissions.  It's

8     undermined by the complete e-mail exchange between William

9     Kaplan and Adam Sherman, and it's undermined by his own

10    documents.

11          THE COURT:  All right.

12          Anything else now?

13          MR. LEVINE:  No, I just reserve time for rebuttal.

14          THE COURT:  All right.  We will give you five minutes.

15          You go ahead then, Mr. Catafago.

16          MR. CATAFAGO:  Thank you, your Honor.

17          Counsel did a very good job of arguing facts.  It

18    sounded almost like a jury summation.  It certainly didn't

19    sound or feel or look like a preanswer motion to dismiss under

20    12(b)(6), which is what this is.  He didn't cite any law.

21          Your Honor asked counsel, isn't proximate cause

22    ordinarily an issue of fact?  In fact, at page 18 of our

23    memorandum of law, footnote 4, we cite cases from the Second

24    Circuit Court of Appeals and the New York State Court of

25    Appeals standing for the exactly that proposition which your

Haqnmala

1    Honor highlighted, which is ordinarily it is rare for an

2    intervening cause not to be decided as a matter of law.

3         It is rare.  And the reason, your Honor, is exactly

4    what you pointed out to Mr. Levine.  There can be more than one

5    intervening cause.

6         And so this concept of taking unproven allegations in

7    a settled state court case, allegations that spoke of issues of

8    law that were never decided, such as whether or not my client

9    had legal capacity to enter into the gift agreement, are not,

10   cannot be decided a preanswer motion to dismiss, nor can they

11   be decided on summary judgment for that matter.

12        More to the point, Judge -- I want to deal with this,

13   because it is annoying.  We have 21 exhibits, moving exhibits

14   on the preanswer motion to dismiss, and counsel says, well,

15   part of it is I want to show that Catafago represented Robert

16   Malta or works with Adam Sherman.

17        Yeah, I do.  When I left Rogers & Wells many years

18   ago, I didn't have much business.  God bless me, all the

19   business I got was from the other side of the table.  It is not

20   uncommon that the defendant or the plaintiff who I depose hires

21   me, and that's what happened here.

22        And he got together with his brother, and Adam Sherman

23   was 26 years old -- sleazy Adam Sherman -- who was basically

24   taking documents prepared by this law firm with dozens and

25   dozens of years of experience and giving them to his client.

Haqnmala

1   He was Robert Malta's counsel.  He never represented Diego

2   Malta.

3           What we don't hear from counsel is what he's admitted,

4   what is undeniable, that from February 2016 retainer agreement

5   until the May 2016 gift agreement, they never communicated with

6   their client, the plaintiff, other than to talk to him about

7   the retainer.  They never told him anything about the tax

8   implications.

9           So, Judge, we cannot take the Supreme Court teachings

10  *Iqbal* and expand it so much that a case like this gets decided

11  as a matter of law on a preanswer motion to dismiss.  Absurd.

12          They had an nondelegable duty to advise their client.

13          THE COURT:  Let me ask you a couple of questions.

14          MR. CATAFAGO:  Yes, Judge.

15          THE COURT:  As I understand it, you're claiming that

16  Mr. Malta, Diego, that he lacked the capacity to sign the gift

17  agreement.

18          MR. CATAFAGO:  He did not, Judge.  He did not lack

19  legal capacity.  It's never been determined that he did.

20          THE COURT:  I thought you were claiming that.

21          MR. CATAFAGO:  No.  In the state court case he was

22  claiming that.  But that is not an admission, Judge.  That is

23  an allegation.  It is not an admission.

24          THE COURT:  If he makes the statement through his

25  agent, that is attributable to him, right?

Haqnmala

1          MR. CATAFAGO:  Yes.  But it doesn't establish the

2     fact.  If he says I am 12 and he was 18, it doesn't establish

3     the fact.

4          THE COURT:  Because someone says something doesn't

5     establish the fact, hardly ever.  But it is a statement.

6          MR. CATAFAGO:  It's not --

7          THE COURT:  You say he's not claiming that he lacked

8     capacity to sign the gift agreement?

9          MR. CATAFAGO:  That's correct, Judge.  In fact, what

10    he claimed in the --

11         THE COURT:  I thought the claim was that he lacked the

12    capacity, that he was drunk and high on drugs, and that he was

13    induced to sign the agreement by his brother.

14         MR. CATAFAGO:  In addition, your Honor, the claim in

15    the bankruptcy court, which was preserved, was that Fox Horan

16    didn't do its job and didn't advise him.

17         THE COURT:  Isn't he claiming that he was induced on

18    sign the agreement by his brother?

19         MR. CATAFAGO:  That is what was claimed in the settled

20    case.

21         THE COURT:  Yes.

22         MR. CATAFAGO:  That is what was claimed, but was never

23    proven.  And I submit to you, your Honor --

24         THE COURT:  If those things were so, don't they

25    qualify as intervening causes that would preclude the

Haqnmala

1    liability?

2            MR. CATAFAGO:  Absolutely not, Judge.  Absolutely not.

3    That is not an intervening cause.  An intervening cause is if

4    something is not reasonably foreseeable.  If, for instance, Fox

5    Horan prepared the gift agreement, someone broke in, took it,

6    and took it to Diego Malta to sign, not when the document is

7    forwarded for signature.  For counsel to twist those e-mails in

8    his client's reply declaration is just absolutely improper on

9    this motion.

10           There is no question that there is no inconsistency

11   between the position in this lawsuit that the document was

12   signed at the direction of Fox Horan and the documentary

13   evidence.

14           THE COURT:  Has Diego paid the taxes yet?

15           MR. CATAFAGO:  That is a very good point, your Honor,

16   because that is the other red herring that I wanted to get to.

17   He has not paid because he doesn't have it.

18           THE COURT:  How can he allege damages?

19           MR. CATAFAGO:  That is a very good point, Judge.  We

20   cited in our brief the claim for legal malpractice arises when

21   the liability -- and this is why they didn't move on this basis

22   this is a throwaway.  It arises when the liability is incurred,

23   not when it's paid.  In other words, if he waited three years

24   and he didn't pay that tax and then he had to pay it, he would

25   be time barred.

Haqnmala

1          Similarly, it is now ripe, and he can raise the issue,

2     and he has raised the issue.  And they haven't raised that as a

3     defense because they know it.  For counsel to get up here and

4     mention it as an aside in his summation argument is just not

5     proper.

6          Your Honor, on the issue of conversion of a 12(b)(6)

7     motion into a Rule 56, I think that the Second Circuit and this

8     Court and your Honor's decisions are very clear on that.  They

9     can't just introduce documents.  Those documents have to be

10    disregarded to the extent they were not integral to the

11    drafting of the complaint or not judicial admissions, or the

12    motion has to be converted under Rule 56.

13         Now, are we arguing that my involvement in now

14    representing my former adversary is relevant?  Is an admission?

15    Because if it is not, those documents have to be disregarded.

16         Are we arguing that all of the other 21 exhibits are

17    integral to the complaint?

18         Well, they weren't, because I prepared the complaint

19    and I've submitted to your Honor a declaration saying that.

20         So I think that's the first issue that your Honor has

21    to deal with unfortunately.

22         THE COURT:  Let me ask you this:  As I understand it,

23    Diego claimed in his filings in the state Supreme Court and in

24    the bankruptcy court that the gift agreement was really a

25    device or a means to steal his assets and that that was

Haqnmala

1    perpetrated by his brother, right?

2         MR. CATAFAGO:  That was his belief at the time.

3         THE COURT:  That's what he claimed.

4         MR. CATAFAGO:  That is what he claimed.  That's not

5    what was proven.

6         THE COURT:  Isn't that a contradictory admission that

7    the Court can take judicial notice of?

8         MR. CATAFAGO:  It is not, your Honor, because it

9    doesn't contradict the legal malpractice.  They are not

10   diametrically opposed.

11        If the 26-year-old was doing something bad, then the

12   law firm, independent of that, had a nondelegable duty to

13   advise their client to sit with their client to tell their

14   client what the document was.

15        They shouldn't have put it in the hands of the

16   26-year-old "sleazy" attorney who took it upon himself.

17        Your Honor it's totally bogus.  We are going to do

18   depositions.  We haven't had a Rule 26 conference.

19        I would be shocked frankly, respectfully, your Honor,

20   if you were to grant the motion.  We are going to proceed to

21   depositions, and we are going to see who's telling the truth.

22        The truth is your Honor, Kathleen Kundar, who has 35

23   more years experience than Mr. Sherman and is a very well

24   established attorney, wrote to her client, who she's not

25   throwing under the bus, Robert Malta, and she said --

Haqnmala

1          THE COURT:  Slower.  We have an all-star court

2     reporter --

3          MR. CATAFAGO:  Sorry.

4          THE COURT:  -- but he doesn't have three hands.  A

5     little slower.

6          MR. CATAFAGO:  Yes.

7          So Kathleen Kundar, who was the quarterback on this

8     team of Fox Horan lawyers on this estate plan, wrote to

9     Mr. Malta, Robert Malta, and said the gift is good as far as we

10    know.

11          And Bill Kaplan, the same Bill Kaplan who is now

12    disavowing it is ready to testify that it's good, it's done.

13          That's the whole point, Judge, it couldn't have been

14    undone in the state court.  Kudos for me for getting rid of

15    that case because Diego had no shot.

16          If there is another tortfeasor who was released in

17    that case, the law provides for, there is not going to be

18    unjust enrichment.

19          If they show proximate cause, more than one proximate

20    cause, they get a setoff 15-108 of the General Obligations Law.

21    They shouldn't argue that as a matter of law their independent

22    legal obligation as counselors is wiped out.  It's ridiculous.

23          They prepared the document.  They sent the document.

24    They failed to advise or to even speak to their client about

25    the tax implications.  I have just never seen anything like it.

Haqnmala

1      As far as legal capacity, whether he was drunk at that
2   moment or not doesn't really disavow that or remove their
3   obligation as counsel for their client.

4      Your Honor, you know, you asked a very good question.
5   What is the factual legal basis for estoppel?

6      It's absurd.  It is an absurd argument.  Listen for a
7   second to what they are saying.  They are saying that Diego
8   Malta should be estopped from claiming legal malpractice
9   because he got the benefit of the tax estate planning.

10     Proof?  Where is the plan?  Where is the mother's
11  affidavit?  Where is anything?

12     Because he settled the case, that is proof that he got
13  the benefit?  That's problem number one.  No proof.

14     Problem number two, as a matter of law he admitted it,
15  counsel admitted it, there was no detrimental reliance by Fox
16  Horan on anything Diego Malta did.  That is a fundamental
17  element of promissory estoppel or any kind of estoppel.

18     Of course, a third issue is it's ludicrous.  The
19  estoppel that would apply in such a circumstance, if Diego
20  Malta were to tell the state I'm not paying tax after he got
21  the benefit, that's what estoppel is.  It's not to shield a
22  third party, a nonparty from a claim of legal malpractice.  It
23  doesn't work that way.  That's not what estoppel is.

24     As far as being intoxicated as an intervening cause,
25  Judge, the legal requirements for proving lack of legal

Haqnmala

|     |
| --- |
| 1 |

capacity are very strict and very tough.  He couldn't meet

those elements then in state court, and he can't do it now.

That doesn't knock him out of the box.  That entitles them to

cross-examine him.  That is all.  As far as the --

THE COURT:  If we get that far.

MR. LEVINE:  Yes.

THE COURT:  That would be a lot of fun,

cross-examination.

MR. CATAFAGO:  It is going to be a lot of fun, because

I am going to sit there with lawyers with about 70 years of

experience and I am going to say to them you took that

26-year-old guy sitting there and you thought he was the guy,

or you thought the other guy was tricking him?  That's what I

am going to do.

You, you big formal white-shoe law firm, five months

of representation, you never even spoke to the guy.  This is in

the record.  We had to expand the record because of what they

did.

Your Honor, we also presented a proposed amended

complaint under Rule 15 of the federal rules of civil practice.

So if your Honor is inclined to accept any of this extraneous

material, we respectfully request the opportunity to amend if

the matter is not converted to a Rule 56 summary judgment.  If

it is --

THE COURT:  I know you do.

Haqnmala

1      MR. CATAFAGO:  We respectfully request the opportunity

2  to submit a Rule 56.1 statement and additional proof.  But, in

3  fact, the proof that you have now is more than enough to

4  perhaps even grant reverse summary judgment against the

5  defendants.  They have bills --

6      THE COURT:  I have enough here if I convert it to a

7  Rule 56 to make a reverse summary judgment?

8      MR. CATAFAGO:  I think so, Judge.  I think as a matter

9  of law their noncommunication with their client --

10      THE COURT:  I would love to see you defending that, if

11  I rule that way, in the Court of Appeals.

12      MR. CATAFAGO:  Gladly, Judge.  Give me the

13  opportunity.  Gladly.

14      What we did here for now is we gave a taste, an

15  inkling of all the proof that we have against them because they

16  don't have anything.  They don't have an e-mail or a letter or

17  a phone call to Diego Malta saying:  This is the deal.  This is

18  what is going to happen.  Your mother, the donnee, might not

19  undo the gift because the gift is unconditional.  You are going

20  to have to pay taxes.  This is how much.

21      None of it, Judge.

22      So, instead they get up and they said, well, it's an

23  implausible theory.  They latch on the word the Supreme Court

24  used in *Iqbal*.  That is not what implausible is, Judge.

25      THE COURT:  How old is Diego now?

Haqnmala

1            MR. CATAFAGO:  Diego is about -- I want to say 60.

2       60.  He's in Florida.

3            We have diversity of citizenship jurisdiction.  He

4       will come up, and we will do depositions in the meantime.

5            Judge, we gave as part of the record all of the

6       invoices that Fox Horan prepared on this transaction that they

7       sent only to Robert Malta.  Those invoices prove exactly what

8       they didn't do.  They didn't do a gift tax return until after

9       the fact.  They didn't do appraisals until after the fact, if

10      at all.  They never communicated not just with Diego Malta, but

11      with their other client, the late Joe Malta.

12           How does that work?  We assume that the 26-year-old

13      was the guy?

14           The problem is he's not on their letterhead.  He's not

15      their employee.  They made an assumption that was wrong

16      perhaps.  They acted unreasonably, not perhaps but

17      definitively.  That's what we believe, your Honor, as a matter

18      of law summary judgment would be in favor of the plaintiff.

19           We gave you an affidavit, a declaration from

20      Mr. Sherman which describes his involvement.

21           They came back with a reply declaration.  Get this,

22      paragraph 7 of defendant Bill Kaplan's reply declaration.  They

23      try to sneak it in under this -- I had to look it up -- Rule

24      106 complete writings rule for rules of evidence for trial.

25      They said, You gave us an incomplete e-mail.

Haqnmala

1      Well, where is all the communications they had with

2 Diego?

3      They use that to leapfrog into statements of fact,

4 paragraph 7 of the reply declaration dated October 19, 2017.

5 Diego Malta chose to sign his gift agreement without informing

6 me.  That is a factual statement.  Whether it's true or not

7 whether it is a plausible or not is irrelevant.

8      What is relevant procedurally, because this is a court

9 of law, is this has no place at all on the preanswer motion to

10 dismiss.  None.

11      This really typifies what they've done.  I mean,

12 they've taken other claims and they've looked to see how they

13 can attack the undisputed facts in this case to try to supplant

14 the legal principles that control in this case with those

15 facts.

16      But it goes back to exactly what your Honor said.

17 That is, you can have more than one proximate cause.  There

18 isn't enough here for the superseding cause defense to prevail

19 as a matter of law.  There's just not.

20      If your Honor has no more questions, if I can reserve

21 just to --

22      THE COURT:  No.  No.

23      MR. CATAFAGO:  Oh, OK.

24      THE COURT:  There's no surrebuttal in my courtroom.

25      MR. CATAFAGO:  Not even on the cross-motion, the

Haqnmala

1    amendment?  You know what, I'm good.

2              THE COURT:  OK.  Thank you very much.

3              MR. CATAFAGO:  Judge, I think you got -- the two

4    questions that you asked of counsel on the law, both in terms

5    of proximate cause and in terms of estoppel, which is really

6    laughable, I mean it's enough.  We don't even have to get to

7    the procedural issue.  Thank you.

8              THE COURT:  I get your points.

9              MR. CATAFAGO:  Thank you.

10             THE COURT:  Mr. Levine, you have five minutes.

11             MR. LEVINE:  Thank you, your Honor.

12             With regard to the question, is the issue of proximate

13   cause a matter of fact or matter of law, I direct your Honor's

14   attention to page 12 of the moving memorandum, in which we cite

15   New York Court of Appeals authority stating, The question of

16   proximate cause can be determined as a matter of law when the

17   plaintiff's alleged injuries are caused by an independent

18   intervening act, which is exactly what we have here.

19             I also direct your Honor's attention to paragraph 34

20   of Diego Malta's state court complaint, and that's Exhibit 2 to

21   the moving papers, in which he says at the time of the

22   presentation of the gift agreement on May 9, 2016 by Adam

23   Sherman without the presence of the Fox Horan firm to represent

24   the interests of their client, the plaintiff was heavily

25   intoxicated and under the synergistic influence of Xanax,

Haqnmala

```
1    rendering him devoid of judgment and capacity to execute a

2    document that effectively gave away all of his assets.

3              There is your superseding cause right there.

4              And the presentation that is described in the state

5    court action is put in context by the e-mail exchange of May 9

6    between Adam Sherman and Bill Kaplan.

7              The retainer agreement is signed February 22, 2016.

8    Nothing happens according to the plaintiff.  No communication,

9    no nothing.  The e-mail exchange shows that it was Adam Sherman

10   who requested Bill Kaplan to prepare a gift agreement for

11   Diego.  That gift agreement is sent at 2:34 p.m. that day, that

12   draft agreement, "For your review, for your comment and perhaps

13   signature."

14             THE COURT:  So should I convert this into a Rule 56

15   motion?  Does it make any difference to you?

16             MR. LEVINE:  If you grant the motion in my favor, then

17   I am all in favor of converting.  But there is no way that the

18   plaintiff wins on summary judgment here.  There is no need to

19   convert because your Honor can properly take judicial notice of

20   everything --

21             THE COURT:  When you say there is no way the plaintiff

22   wins on summary judgment if I convert it into a Rule 56

23   motion --

24             MR. LEVINE:  Right.

25             THE COURT:  -- do you mean --
```

Haqnmala

1          MR. LEVINE:  We have a very --

2          THE COURT:  Wait.  Would you please let me finish.

3          MR. LEVINE:  My apologies, your Honor.

4          THE COURT:  All right.

5          When you say there's no way the plaintiff wins, do you

6     mean by that there is no way you lose this motion, or do you

7     mean that there's no way I grant him summary judgment?  Which

8     do you mean?

9          MR. LEVINE:  There's no way you grant him summary

10    judgment.

11         THE COURT:  All right.

12         MR. LEVINE:  No way.

13         THE COURT:  OK.  I just wanted to make sure.  The way

14    you said it, you sounded like --

15         MR. LEVINE:  We have been very careful not to put in

16    affidavits or documents or statement that your Honor cannot

17    take judicial notice of.

18         Our motion is based exclusively on Diego Malta's own

19    words.  It was Diego Malta who was bringing in matters that

20    were extraneous to the pleadings that your Honor cannot

21    properly take judicial notice of.

22         We put in an additional e-mail under the rule of

23    completeness.  Adam Sherman gives you a truncated e-mail

24    exchange.  We say, no, look at the final part of this exchange.

25         THE COURT:  I understand the rule of completeness.

Haqnmala

```
1          MR. LEVINE:  Certainly.

2          Mr. Catafago asked, Where is the estate?  Look at

3    Exhibit B of his answering papers.

4          THE COURT:  You have another two minutes.

5          MR. LEVINE:  OK.  Generation-skipping trust.

6          So they followed the plan.  We are not basing anything

7    on unproven allegations.  We are basing the motion on

8    admissions.

9          We never asked for appraisals.

10          Let's look at Exhibit E of Mr. Catafago's papers.

11    This is the Fox Horan bill.  April 1, 2016, before the gift

12    agreement is signed, Bill Kaplan bills 2/10 of an hour to

13    appraisal call.  He bills a half hour to an appraisal call on

14    April 4, 2016.  He bills 2/10 of an hour on April 11 to

15    appraisal e-mails.  He bills another 2/10 of an hour on April

16    14 to appraisal e-mails.

17          He wasn't asking for appraisals?

18          Mr. Catafago's own exhibits show that there was a

19    request prior to the drafting of the gift agreement.

20          A final note on judicial notice.  Mr. Catafago's own

21    amended complaint refers to the state court and the bankruptcy

22    court proceedings.

23          OK.  It's fair game now.  Your own complaint, what you

24    want to file in this court your own amended complaint that you

25    want to file in this court is referring to those prior actions.
```

Haqnmala

1    OK.  Let's have them.  What happened in those prior actions?

2    What happened in those prior actions totally undermines this

3    case.

4              Thank you, your Honor.

5              THE COURT:  Thank you, Mr. Levine.

6              Thank you, Mr. Catafago.

7              MR. CATAFAGO:  Thank you, your Honor.

8              THE COURT:  I will reserve decision.

9              Thanks very much.

10             We are in recess.

11             (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25